A. With the lawyers who are going to argue the case, please approach the bench and introduce yourself to the court, please. Good morning, Your Honor. Robert Hirshhorn, Office of the State Appellate Defender, on behalf of... I'm sorry, Counsel, I didn't hear your name. Robert Hirshhorn, Office of the State Appellate Defender, on behalf of Progeny Malaysia. Good morning, Your Honors. Assistant State Attorney Alan Spalberg, on behalf of the people of the state of Illinois. Okay, let's... How much time do you want for rebuttal? I'd like to reserve a few minutes, if I might, Your Honor. Before you start, I have a question for you. Certainly. It has to do with the record of this case. It seems that the notice of appeal is not in the record. It was placed in there as a piece of paper, but it's not in the bound part of the record. So I would suggest to you to file a supplemental record before the end of the day, because otherwise this court would not have jurisdiction to hear this case. It is timestamped, so there shouldn't be a problem. If I might just observe, Your Honor, if I'm filing a supplemental record, I think I've got to go back down to the circuit court and have it certified down there. I don't know if I can do that by the end of today. Well, at least file the motion. Certainly, Your Honor. Again, my name is Robert Hirshhorn. I'm here for Jose Malaysia. And I promise not to use the word segregation. Mr. Malaysia was convicted of first-degree murder and vehicular invasion in 2014. This was for offenses that occurred in 2010. He received sentences of 40 years for the murder, a consecutive 15 years for the add-on penalty for the presence of a gun, and then a consecutive 10 years on the vehicular invasion. Thus, the total sentence here on Mr. Malaysia was 65 years, which for him, given his age, is going to be a virtual life sentence. Now, on appeal, we've raised five issues. And I'd like to touch on each of them in some fashion here, because they're all kind of pieces of a puzzle here, pieces of the pie in this case. A trial is supposed to be a search for truth, guided by basic notions of procedural fairness. Now, while each issue we have raised on appeal is discrete, they share something in common in a lot of respects. And what I'm going to call here is really an element of gamesmanship in the way this case proceeded in the circuit court, that they're called my client of a fair trial. I'm asking your honors to kind of look at the state's conduct, both distinctly issue by issue, and also in the aggregate. Here, the state allege, for example, that the motive for this killing was revenge for a fight that occurred in the Green Dolphin Tavern, a beating suffered by Mr. Malaysia. But then they successfully opposed an instruction on a lesser-included offense instruction based on provocation arising from that same fight, saying on appeal that it had nothing to do with him. The state explicitly dropped felony murder charges before the jury was impaled in this case, and then tendered felony murder jury instructions. The state alleged that the mental state for the vehicular invasion was the intent to commit murder, and maintains that nonetheless there is an independent felonious purpose motivating the product of felony for the felony murder. The state on appeal, and I found this most curious, took the position that the vehicular invasion was over before the murder occurred. And as I understand the very statute defining felony murder, you have to be either attempting or committing the predicate felony for felony murder liability to attach. So if it's over beforehand, it can't be a predicate felony. The state opted mid-trial to introduce two prior and consistent statements from the same witness, Maria Reyes, when she suddenly was completely unable to recall anything. Now, the unifying feature of all of these issues is that this really is a, it results in gamesmanship. It deprived my client of a fair trial from start to finish. I want to really peer a bit on it. I'd like to start first with the last issue, the lesser-included offense instruction. This is the one issue here that is perfectly preserved. Counsel tendered the instruction at the jury instruction conference. The state objected. It wasn't given. It was included in the post-trial motion. But basically, the defense wanted the jury instructed on the lesser-mitigated offense of secondary murder based on serious provocation. The evidence of serious provocation was exploited by the state in its arguments to the jury, if I can quote from the state's rebuttal argument. We know Malacio had the motive to want to kill Carlos Aguirre. We know that from the evidence. Jerry Perez told you, friend of Carlos Aguirre, that there was some altercation defendant Malacio had inside the bar with people who were talking to Carlos Aguirre. We don't know who those people are. There's been some insinuation that it was Juice or Hugo, whoever, that Maria came in from. But there's no evidence in the records to suggest who it was. Those people remain unknown. The state used this as the doorway, the keyhole, to argue that what happened outside the bar was caused by the fight inside the bar. And that's crucial here because if the state's going to use it for motivation, if the state's going to use it in that fashion, the defendant has to be able to use it. And he wanted an instruction here on the lesser-included offense of second-degree murder. The state opposed it, and that was error. It deprived him of a jury consideration. Can I interrupt you? Certainly. I'm following your argument, but if the victim is not the person who provoked him, why is he entitled to second degree if the victim is not the provocateur? Let me answer that in two different ways here. One, because that's the state's theory of the case, and the defendant is responsible for the state's theory of the case. But if the state is using it to provide motivation, the state's argument was that Carlos Aguilar was talking to the people in the bar who later assaulted Jose Malacio, and that somehow that was what set this train in motion. It set the entire thing forward. But that also plays a little bit, I would suggest to your honors, in a converse way in Issue 3, the reasonable doubt issue. We've described in our briefs to your honors that this offense doesn't make sense in that fashion. Exactly the fashion that your honors find that. That's why I'm not, yeah, I'm sorry. I'm sorry. I didn't mean to interrupt you, Mike. The wheels are rolling in my head. The state doesn't have to promote it, but you do have to, well, introduce some evidence of mitigation, a mitigating factor, and that's why I'm saying, how does Carlos not being the provocateur equal mitigating evidence? Well, your honor, I respond to that in several ways. One, the question, you know, the state doesn't have to prove motive reminds me of the logic that the defendant doesn't have to testify. But if he does testify, he's going to be judged on his testimony. The state made the conscious decision to place that at issue. The state elicited the evidence. I agree with you that it goes to a reasonable doubt argument, but I'm trying to find out how it supports your second defense. If you accept the state's premise that that's what started this, that Mr. Malacio grew angry because of this fight, and he blamed Carlos Aguilar for this fight because he was in association with these people in the bar. And by the way, when we look at that, I would point out to you that we have almost no evidence here as to the words exchanged between Carlos Aguilar and the people in the bar. We do have several witnesses who testified that there was some conversation between the two of them. But the state used that evidence to say, okay, now Mr. Malacio associates Carlos Aguilar with the people who assaulted him, and that's why this killing occurred. If that's the case, if he is part and parcel of the people who assaulted Mr. Malacio in the bar, then that's the provocation. He's entitled to ask the jury to determine whether that is a mitigating factor. And on this, I would emphasize to you the McDonald case. And I think the McDonald case here, the recent Illinois Supreme Court case, is very crucial in this regard. We cited McDonald way back before the Supreme Court had filed its decision. The state cited it afterwards, and I addressed this in a reply. But the important thing, I think, for purposes of McDonald is not that McDonald resolved the question as to whether the review is abuse of discretion or de novo. The important aspect of McDonald is McDonald said, we're not going to ask the judge to make credibility determinations in determining whether or not to give an instruction. Because credibility determinations belong in the jury room. If the judge has to determine that there's some credible evidence to justify the instruction, then he's stepping into the role of juror, and we don't want trial judges to do that. That's why I say if there's some evidence to justify the mitigating factor, it should go to the jury. Here, there was some evidence. The evidence that the state put before the jury, the evidence that the state used here to exploit the entire fight as the motivation here. The state can't argue, and I would say it's just fundamentally unfair to go hot and cold on this. If it's going to be exploited by the state to explain the motivation for the killing, then the defendant is entitled to his theory of that motivation as well. And the only way he gets the jury to consider that is if the jury is instructed in the first place that they can consider this as a mitigating factor and reduce it from first degree to second degree murder. This is not, however, the only instructional issue, frankly, that we raised in our brief. I want to touch upon now basically the first and second issues, which somewhat interlock. As I said, at the beginning of trial, the state's attorney stepped up and now we do everything except counts one, two, four on the murder. Intentional murder, knowing murder, strong probability of death or bodily harm murder. Extended term. Pardon me? And the gun. And the extended term. Not based on the gun, Your Honor. The gun enhancement was in counts one and two, I believe, as well. It was the extended term based on there being another felony involved. But it wasn't felony murder. Felony murder was counts three and 13, and those counts were nollied. They were dropped. A nollie is a recognized legal tool that has a recognized legal result. It is, in the definition that was given to us by the Supreme Court in the Hughes, the formal entry of notice that the state doesn't intend to prosecute these counts.  And then the state tenders instructions on felony murder. There's no indication on the record that I found where the state said we're tendering the instructions and, by the way, counsel, we're going back to felony murder. No express statement to that effect. I'm not denying that there was a felony murder instruction in the packet. I'm pointing out that the whole packet was tendered, and there's no indication in this record that defense counsel was immediately aware that they were trying to revive this so that he could object to it, or he could take issue with it, or ask why, or the court could make any inquiry as to why that nollie was no longer being filed. It's just tendered. And the state, and this is two days later, in their brief, the state acknowledges that defense counsel, after being tendered the packet, told the court two days later, I haven't even had time to take a look at the instructions yet. Because he's in the middle of trouble. He's got multiple witnesses, including expert witnesses. He's got witnesses, Maria Reyes and Arturo Cavallo, where the state is now trying to introduce prior inconsistent statements substantively. There's a lot going on here. It isn't like counsel had a lot of time to go flipping through these instructions. But the point here for issue one is that the state dropped the theory. It explicitly nollied the theory. The state, in its brief on appeal, acknowledges that it had nollied those. And basically it's saying, well, you shouldn't have believed us. Action should have consequences. This kind of gamesmanship shouldn't be rewarded. This was unfair here. This compromised the provision of a fair trial because you're putting every defendant in the position where when a nollie is entered, he doesn't know if he can rely on it. When this court rules on whether or not to enforce this nollie, it's not just this case that that's going to affect. It's every other case that the state nollies. And I'm sure your honors are familiar with how often that happens. A nollie should have a meaning. The Supreme Court told us it's the formal entry of notice that you're not going to pursue this. But the state pursued it anyway. That's just fundamentally unfair. And one of the ways, and the particular way that I want to emphasize that it's unfair, is because of two things here. One is that felony murder takes out the need to prove a homicidal mental state. It takes out the normal mens rea for homicide. When you're pursuing felony murder, you have to just prove the mens rea for the predicate felony, be it aggravated battery here. Can I interrupt for one second? Certainly. Because, I mean, frankly, I have not read this entire record. Did the state argue, this is just for my edification, did they argue that they didn't have to prove intent? I think the way this comes up is it usually comes up. The general instruction on murder says we have to prove either A, intent, or B. Nollie, nollie, nollie, nollie. Yes. We have to prove only one of these three. If you find one of these three. Yeah, that's what I'm saying. There was that instruction. I believe there was the argument that those orders mean we don't have to prove all three. There's four of them if they've got the felony murder in there. You're saying they have the felony murder in the instruction? Yes. Okay. And, again, I just want to emphasize that that's unfair because it takes out the homicidal mental state. Well, I was at 26th Street for 18 years. Yes. I know. We had lots of discussions on what's going to stay in and what is going to go out. But, as I said, and I'm acknowledging this to everybody, I have not read all of this record. I have not had time to. I certainly will. I just wanted to know that so I could understand your argument. I would warn you, Honor, that it's a long and tedious record. I'm sorry. It should be interesting. When I read the record, this defendant wasn't found guilty of felony murder, was he? There was just a general murder patronum. That's the second point I wanted to get to here. As I told Justice Lampkin, that there were two ways I wanted to respond to that question. The second one is the state is basically hiding behind the one good count rule. And I think it's a mistake to use the one good count rule here because we have some insight into what the jury was thinking here. Mr. Bellacio was tried together before this jury with Mr. Gonzalez. He got the 15-year add-on, not the 25-year add-on, which means that there's no finding here by this jury that he personally discharged the firearm. The firearm was discharged by someone else. The only person the state was able to put a gun in the hand of was Robert Gonzalez, and he was acquitted. Now, yes, I know that for accountability, you don't have to prove that the principal was guilty. It's not required by the statute. I'm not suggesting otherwise. But I'm saying we have a little more insight here than we normally do when a jury returns a generalized guilty verdict and multiple theories are presented. The state argued accountability here. They made sure that there was accountability language over defense objection in the instructions. They argued accountability to the jury before trial in their opening statements. They argued it in their summations and in their filing. Mr. Bellacio. Let me ask you this. If this defendant was charged with just first-degree murder and was found guilty of felony murder, would that be a fair verdict? Are you suggesting the Maxwell situation? He had a Maxwell situation. I think Maxwell doesn't apply here because the facts of Maxwell differ from the facts here. Maxwell and Allen, which is so different. In all cases, the facts differ. Yeah. You see, the theory that you're presenting to this court is that it's unfair when you have an indictment for felony murder to, at the last minute, nolly it and then give instructions on felony murder. Yes, I think that's the heart of that first issue, certainly. And it's important here because I think that's the key fact. Maxwell and Allen said that you didn't have to charge felony murder when you charged a one-murder or a two-murder because there's only one murder in Illinois. And in those cases, the defense was on notice from the very beginning that the state was going to pursue felony murder. The state told the court, and the court overruled defense objections in Maxwell at the outset of trial to sending felony murder to the jury. Here, the exact opposite has occurred. Here, we have the state telling us, don't worry about felony murder. We're entering a null. But what you're doing here is you're telling us of all these things that the state did wrong. And even if I agree with all these things are bad, how was your defendant prejudiced when an eyewitness gives a statement that she saw him shoot the victim? There's other witnesses that place your defendant near the scene. Some people saw shots fired, some heard shots fired. I would respond separately. One, respectfully, no one saw my client shoot the victim. You're referring to Maria Reyes. Yes. The state said on page, if I'm recalling correctly, I think it's page 44 of their briefing. They admitted that Reyes never saw him shoot. She saw a black object in his hand, and she heard shots. The state has posited a second gun in this situation. We don't know who shot. If Reyes saw Jose Malacio shoot Carlos Aguirre, we'd be talking about a 25-year ad on here, and we're not. There's a reason for that. The evidence didn't support personal discharge of a firearm. The state knew it. Did they submit that instruction? I don't believe that. To be honest, I don't recall that instruction being included. So you're telling me that if a person is seen with a gun in their hand and see him curse their head and that all of a sudden there's shots fired, that that's not evidence? Your Honor, no one said gun in his hand. Your Honor is engaging in a presumption that black object equates with gun. Okay. We had a witness testify that those shots that she heard came from an alley. That was part of, I believe, Mr. Kravatov's testimony, that when he was there, he saw someone in the alley fire shots. But again, the point here, I think, Your Honor, is a little bit broader than just this case. I think you've got to think in terms of what an alley is going to mean. If you allow the state to nolly a theory and then revive it, it struck a mental state that is important here. It allows the state to take a shortcut here. It's just pure gamesmanship. There was no reason for it. The nolly was entered on November 18th. They tendered the instructions on November 19th. You agree we have to fight prejudice here. I think prejudice is here, however, Your Honor. I think it's more than just the dropping of the mental state that's required for the homicide. I think given what we see here from the jury, that they acquit the co-defendant, the only guy that they can put the gun in the hand of. Because clearly, Jose Malacio didn't have a gun because the state's theory is he called for other people to come with guns. That's the state's theory. So Jose Malacio never had a gun. And again, that's why we're only dealing with the 15 we ran on. But this whole thing ultimately reverts to your initial question about don't we have to assume one good count here. And I think there's a logic to assuming one good count when you have one fact finder with one defendant returning a verdict where they have multiple theories that they can use against that one defendant. But here we have the additional insight of that jury making determinations as to the co-defendant who had the gun, who's acquitted. It tells us a little bit. It gives us some insight. It gives us not necessarily a window into the jury room, but we can see a little bit more than we could otherwise. And I think the one good count rule has to recognize additional facts here in the same way that I'm suggesting, that this court has to be concerned about the consequences of not holding the state to its knowledge, not just in this case but in other cases. Having said all that, I know I'm over time here. I want to at least touch a bit on Issue 3. This whole thing is resolvable under People v. Morgan, independent felonious intent. The jury, the state pleaded that the mental state for the predicate felony of vehicular invasion was the intent to commit first-degree murder. They had the jury instructed on that. Once you've done that, you're bound by it. You can't, on appeal, try and say, well, you know, it may have been over before the murder occurred. They didn't plead the independent felonious purpose in the charges. They didn't have the jury instructed on it. For anybody to say other than this count, that it wasn't a valid predicate felony, you would have to ignore the jury's verdict then. This is what the jury was instructed on. And again, we can't just look back at this in retrospect and say, well, you know, we really wish we hadn't done that. We'd like to do something else. We'd like Your Honors to kind of pretend that didn't happen and use broad rules that apply across other cases in this case without recognizing the specific facts of this case. Again, I know I've gone over and … Yeah, well, obviously we're enjoying it, so … Okay. Well, then, in that case, Your Honor, I just want to touch, if I can briefly, I know we've already touched a bit on the reason of doubt because it's implicit in all the others. I want to touch, if I can, just briefly on the issue for the confrontation clause issue and specifically the whole issue as to Maria Reyes and the State bringing in multiple prior inconsistent statements substantively. The State, in its brief, conceded that Crawford changed the rules, that the witness has to be … I don't think there's any argument here from anybody that what happened here isn't testimony. A written statement to a police officer, testimony before the grand jury, virtually by definition testimony. Nobody is fighting over that. The question is whether or not this complies with both the Sixth Amendment and the statute here. And as to the Sixth Amendment, I would point out the State admits in its brief, the witness has to be unavailable and be subject to cross-examination. And neither one really is present here because Maria Reyes said somewhere in the vicinity of 50 times that she didn't remember a thing from that night. She was an absolute void. And I would suggest to you that you can't cross-examine a void. You can't ask the jury to decide, is she telling the truth when she tells us she doesn't remember this? Or is she telling the truth when she tells us she doesn't remember giving the statement, the contents of the written statement, and she doesn't remember the contents of her testimony to the grand jury? There's nothing to compare. There's nothing there. You can't weigh her relative credibility across those two things. When she's a complete void, not merely as to that night, but as to when she testified and gave the statement. There's nothing there. How is a jury to decide which is the more credible when there's no memory whatsoever? I also want to point out that in prepping for this argument, I started looking at the statute and noted all the other statutes that sit there in Section 115. There's a host of them. 115-10, prior statements by child victims of sex offenses. 115-10.2, admission of prior statements where the witness refuses a court order to testify. 115-10.2a, prior statements of victims in domestic violence cases. One of the things that leaked out to me is that there's only one of those that I saw that talked about a witness claiming a lack of memory. There is a specific provision in 115-10.2a, and specifically that would be 115-10.2ac3, that talks about the witness's lack of memory, that that makes the witness unavailable. There's no parallel provision in the provision that the State applied here, 115-10.1. I found that rather striking. This witness would be unavailable by statutory definition if we were talking domestic violence, but there isn't that statutory definition here in 115-10.1, and I would suggest to your honors that there may be a reason for that, that these things are all part of a different puzzle here where the legislature was trying to say, this is when we're going to allow you to introduce prior statements substantively on domestic violence, a plain lack of memory, we know about what goes on in domestic violence situations, but where in 115-10.1, which is the statute we're talking about here, in that instance we're talking about usually what are called flip witnesses. I believe the case law uses the term flip witnesses. And for that, when we're talking about flip witnesses, it's usually a witness who says A when talking to police or talking to a grand jury and says not A when testifying, not a witness who claims, I don't remember anything. Well, you have no support for that. That is strictly based on the... Well, what's happening today is that we can't protect witnesses. Witnesses are frightened, so when they come to court, sometimes they have a loss of a memory, but when they give a statement, that's good enough evidence. Well, Your Honor, I would suggest that... This is what happens day after day after day, and it's been that way for more than 50 years. I'm not going to dispute Your Honor in some sense, but I am going to point out that there was no evidence here of any intimidation of Maria Reyes, certainly not in this record that I saw. Your Honor may be inferring that from the fact that she claimed a lack of memory, but I don't see any affirmative evidence here that tells me that anybody communicated any threat to her. In fact, the testimony, and this comes from Jose Malacio's 48 hours of interrogation, and Your Honors have the CDs, or DVDs actually, of that entire interrogation. He was saying he was no longer in the gang. He was a former member of the gang. He still had the gang's respect, but he basically aged out. There was no indication in this record that anybody put screws to Maria Reyes to close her down. Let's save some time for rebuttal. We understand. Okay. Unless there are any further questions, I don't know. Thank you. Good morning again, Your Honors. If I could just start with a couple of clarifications first. In regards to your question, Justice Lankin, was the jury charged with the question of whether or not the defendant personally discharged resulting in great bodily harm? It was not. The jury was only given the 15-year armed with a firearm enhancement option as part of the instructions. In addition, in regards to the Co-Defendant Gonzalez's acquittal, as this Court well knows, even in a joint trial, the evidence affecting different defendants is different, and the jury can assess different defendants differently. And so here, where the evidence was stronger in regards to Mr. Malacio than it was for Mr. Gonzalez, it is not surprising that the jury may have acquitted Mr. Gonzalez but found the defendant guilty. But let me get directly to defendants' broad arguments of gamesmanship that he accuses the people of the State of Illinois engaging. Let me start with Issue 1. It is absolutely true that we did nally the traditional felony murder counts 3 and 13 prior to trial, and that then the instructions did include the typical A3 language, 9-1A3 language, in the instruction. That was, for no better way of identifying it, probably a mistake. It's not really clear how it happened. That's what I was guessing. It had to be a mistake that nobody saw. It is not. They ignored the defense, I would believe. You're absolutely correct, Your Honor. It's not entirely clear what happened. I would direct this court to Count 4 of the indictment, because it's a very unusual count, in that I believe what happened was that everyone assumed it was an ordinary felony murder instruction, even though it wasn't. And the reason why I say it was an unusual count is because it was identified as an extended term count where it drew in the language not of 9-1A3, but of 9-1B6, the felony murder aggravating factor. And I have to clarify, I called it felony murder right now. So once you annulled the felony murder, why present the instruction to the jury on felony murder? Your Honor, as I said, I can't give a definitive answer on that. Because I think it was a mistake. I don't mean it was a mistake, though. I truly do. And I acknowledge that. It was either a mistake or, as counsel said, gamesmanship. There's no indication anywhere of it being gamesmanship. And to impute their motives like that based upon nothing other than what it appears to be is, I would say, improper. I think the best argument is that they weren't prejudiced. Well, Your Honor, it's actually the initial example was the presence that it's forfeited, that there was no objection made. And that's where the key is you identified the Maxwell case as well as the Allen case and, before that, the Warshacki case. All those cases recognize that, in Illinois, first-degree murder is a singular offense with multiple ways of convicting it. And even if there was only a charge of intentional annulling murder, and even if there was no even charge at all of any additional felony, if the evidence at trial supports it, the jury can be instructed on felony murder. That's exactly what the Supreme Court said in the Warshacki case, where the only charges were intentional annulling murder. Counsel was correct when he says that, in the Maxwell case, the State did, prior to trial, inform the defense that they would be seeking a felony murder. The defense objected, and the court allowed the instruction over the defense objection. But the key in Maxwell was that the court found that there was no prejudice from the one good count, where it was a proper instruction based upon the evidence, and there could be no prejudice where we had to assume the intentional murder. But they relied extensively upon Allen and Warshacki, where the courts recognized that the absence of any objection demonstrated the entire lack of prejudice. And that's what we have here. We have no objection at all to the instruction. It was clearly tendered in a timely fashion. It was provided, no objection, no one noticed it. What I believe, however, was that everyone assumed, mistakenly, unfortunately, that count four was an ordinary felony murder count, instead of the unusual 9-1-B-6 murder in the course of a forcible felony, to be able to get to the quote-unquote extended term, which, again, I will admit is also probably a mistake, because, as this court well knows, a finding of one of the eligibility factors doesn't authorize an extended term. It authorizes a natural life sentence. So I'm admitting there was a mistake. However, it's not one that results in prejudicial error to the defendant, because he had full notice as to what he was charged with. He was full notice that it was a murder committed in the course of a felony. The felony was specifically identified in the indictment. It was made clear that the evidence established at trial, the instructions provided. But even so, let me take one step back, even from that, because the concern that the Maxwell Court recognized, which was the danger of allowing a felony murder count to be used in a situation where it would eliminate the state's obligation to prove a culpable mental state for the murder, can't exist under these particular facts. Because, as counsel points out in his brief, the underlying felony in this case was vehicular invasion, and it was charged in count 16, which is attached to the back of the defendant's brief, as vehicular invasion of entering into the car with the intent to commit first-degree murder. So even if the felony murder here was one which was proper or improper, I should say, it didn't negate the state's ability, the state's requirement to prove the defendant's culpable mental state, because the jury defined him guilty of felony murder under that count would still require an intent to commit a first-degree murder. But how about Castle's argument if there was no showing of a discharge of a firearm? Okay. And how could the defendant have been found guilty? There was clearly a showing of a discharge of a firearm. What the evidence couldn't establish beyond a reasonable doubt was who fired the firearm, whether it was the defendant, whether it was Codefendant Gonzalez, or maybe another person. We didn't know. And that's why we didn't charge or why we now have the personal discharge counts prior to the trial, because we knew we couldn't prove that beyond a reasonable doubt, that he personally discharged the firearm. But under the accountability statute, he's responsible for anyone with whom he shares that mental state for the first-degree murder. And so there's no question that the victim was shot. That's undisputed. The only question that might be is who fired the gun. How do you get the accountability statute involved in the facts of this case? Well, we know that there were multiple people involved in reaching and taking the defendant out of the vehicle, or taking the victim, excuse me, out of the vehicle, beating him, kicking him, and then someone shoots. We don't know who fired that gun, but we know there were multiple offenders in the midst of that. Do they have a common scheme here? Well, yes, Your Honor. Clearly, the common scheme would be to pull him out of the car and to, at a minimum, beat him up, as we alleged in the vehicle invasion, to kill him, to commit an intentional first-degree murder. And so under Fernandez and under all the cases, which I recognize are not part of this brief because it wasn't raised in the brief, this is a traditional accountability case where you have multiple offenders taking on a role and engaging in a common scheme of engaging in criminal conduct, and someone dies as a result. That is the traditional accountability case. Now, it is not a traditional felony murder case in this regard. It is a traditional accountability intentionally knowing murder. In regards to his second claim about it being an independent felonious purpose, counsel is ignoring what the OMS report has said about that requirement. Under the Morgan line of cases, starting with Vicer, then Morgan, then Davis, and most recently in Davison, what the OMS report has said is that felony murder cannot be predicated on a felony which is inherent in the offense where the facts are the same of the murder and it does not have an independent felonious purpose, meaning there has to be two factors proven in order to make felony murder inappropriate. So the classic example is the Morgan case where the defendant shot and killed his grandparents, and the question is to, and the felony murder is predicated on both an aggravated battery with a firearm and an aggravated discharge. It was the same physical acts, exactly the same physical acts that supported the offense, supported the murder, and the defendant did not have an independent felonious purpose. In the Vicer case, however, it was a murder predicated on an aggravated battery, but the court held that even though it was the same facts, there was a different felonious purpose there. In Davison, instead, it was, in Davison, let me take a step back, it was an aggravated battery to a child where the defendant threw the victim across the room. It was the same facts with the same mental state, no separate felonious purpose. Davison, however, was different. Davison involved mob action. It was still a mob action intended to do harm upon the victim, but it was separate facts that were committed with a separate intent. This case. This case is the same, the distinct act of reaching into the vehicle and pulling the victim out, even if it had the same purpose, the same identity, the same motive, but the act is different, and so it doesn't satisfy the rule for the independent felonious purpose test as defined by Morgan.  Counsel said that McDonald's controls when it comes to standard review, and it clearly does, because what the Illinois Supreme Court said in McDonald's is that a trial court's decision as to whether or not there is sufficient evidence to support a lesser mitigated offense or a lesser included offense is entitled to the discretion. It's given deference. But what counsel, what the court also said, and what counsel identified, is that the standard for deciding it is, is there some evidence that would support the instruction. What counsel didn't argue here was any evidence that would support the instruction in this case. Counsel pointed to the fact that we established the motive for this otherwise inexplicable killing, but his motive that we established was that there was a beating of the defendant by other people who the defendant may have thought was connected to the victim well before the murder actually occurred, and he's claiming now that that amounts to sufficient provocation to warrant a second-degree murder instruction. But by definition, that cannot be neutral combat. Neutral combat has never extended for hours at a time. It's when two parties, the two identifiable parties, the victim and the defendant, enter into combat willingly together at the same time. That was my, that was what I was trying to get into with counsel. There's this cooling-off period where he supposedly calls Sylvan, calls, I forget the other guy's name. Right. Carlos Aguirre. Yeah. Yeah, I've not, I have never seen a case that had that kind of a cooling-off period where you would, where there would still be mutual combat. And I don't believe you will, Your Honor, because I don't believe they exist. They don't exist under the unreasonable belief in self-defense cases, and they don't exist under the mutual combat cases. And those cases oftentimes cross over into their ideas, but they don't exist in this type of situation at all because the defendant cannot point to any evidence in the record that shows mutual combat, that shows an unreasonable belief in self-defense. In regards to counsel's argument, let me take one second. Yes, we established the motive. Motive is not the same as the defendant's motive. The defendant could clearly argue against the motive as much as he could, use it in any way he could, but it didn't justify a secondary murder instruction in this case under the facts of this case. And then finally, in regards to the claim of, I suppose, claiming it's a Crawford violation, this is well settled here in Illinois law post-Crawford, post-2004. A victim who is on the stand, who is testifying, who is identifying, who then acknowledges that she made a prior statement but then says she can no longer remember is subject to cross-examination. That is sufficient under the Sixth Amendment, and it is sufficient under the statute. I am not familiar, off the top of my head, with the statute which counsel raised for the very first time today in oral arguments regarding domestic violence, but I am certain that it is distinct from this. And I would also point out that the language of 11510.1 was fully and completely adapted by the Illinois Supreme Court when they adapted the Rules of Evidence in 2010, and it is now fully incorporated into Rule of Evidence 801. And so for those reasons, we would ask this Court to reject defendant's arguments and affirm the convictions because while there may have been a mistake, and I admit there was a mistake. I can't explain it. How about the sentence for vehicle invasion? The sentence for the vehicle invasion? Should that be vacated? It would only have to be vacated if this Court found that the jury actually found him guilty of felony murder because then it would be the predicate offense for the underlying offense. It would fall under the King-Docker-and-the-Smith case. But if the one we count here which applies, as the facts clearly show here should apply, this was an intentional murder and it was a separate but related conviction for unlawful vehicular invasion. So there's no basis to vacate that, I don't believe. But for those reasons, we would ask this Court to affirm the convictions and the sentences. Thank you. Your Honor. Thank you, Your Honor, so I'll try and be brief. I know you've already indulged me a bit. Just a couple of quick points here. With regard to the vehicular invasion, I think the State is hung on the fact that they charged the intent to commit murder. This is just another piece of gamesmanship, frankly, here. You can't avoid the fact that that's the way it was charged and that's the way the jury was instructed. The jury returned a verdict on vehicular invasion based on the intent to commit murder. There is no independent, felonious intent here for the predicate felony and the murder. The second thing I want to address here is the notion of one good count. And more often than not, when we discuss one good count, we discuss it in terms of the jury is instructed in several ways that they can reach a murder verdict. And they don't have to all agree on one way. They don't have to all agree it was intentional or all agree it was knowledge of strong probability of death or great bodily harm or all agree on aggravated vehicular, excuse me, on felony murder. If they all agree that it was murder, then we're okay. What I'm pointing out here is that if the felony murder is flawed, if the felony murder theory is flawed, and you have a split in this jury, and we cannot know how the jury split on this because they only got one verdict for it. But if this was a case where three of the jurors decided it was intentional and three of them decided that it was strong probability and six of them decided it was felony murder and we got a bad felony murder count, we can't assume that this is a one good count situation. We can't look at it this way. I think this falls squarely within this court's decision in Hines, which we cited in our brief, where the jury was given competing theories of aggravated battery as a predicate for armed violence, only one of which was a legal theory for the predicate felony. And this court said we're not going to engage in that kind of speculation. We're not going to do that. We're not going to assume away the problem if we can't find a way factually to reach that, to resolve that problem. That's what we've got going on here. The last thing I want to touch on is counsel's comments as to the abuse of discretion. Well, do you agree with counsel that you have to have a finding of felony murder in order to vacate the invasion? I think that it's, frankly, you don't need it because if there's only one form of murder, if you're going to go with that one good count, then it gets merged in anyway. If the felony murder gets merged into the intentional murder, then all the baggage that is attached to that also gets merged in. But in any event, even without that, I don't think you can get the vehicular invasion here because it's part of it. The whole of that 10 years has to go. It can't, it merges in to the murder or to the invalidation. What case do you have that would support that? I think Morgan and the entire Morgan line of cases support that, Your Honor. The last thing I want to touch on is just on the lesser-included defense instruction. Counsel was talking in terms of the cooling-off period and the abuse of discretion statute that would be applied here. I would suggest, Your Honor, that it is an abuse of discretion if the trial court engaged in weighing the credibility of the evidence, weighing, the actual weighing. That's the abuse of discretion that we're talking about here. And when we talk about cooling-off period, counsel was referring to hours. I don't recall anywhere in the record that it said hours. I think it was put at somewhere around 30 minutes at most. And I want to point out to Your Honors that this isn't a 30-minute cooling-off period. Things get worse before they get better. The fight occurs in the Green Gotham Bar. He is assaulted by a group of men. The bouncers throw him out. He's the victim of the assault, and he gets thrown out. Why? I mean, I think it's obvious that it's easier to throw out one guy than five, but put that aside. That guy right there, he's throwing out when he's the victim of the fight. And then he's babysat outside by a bouncer. This isn't a cooling-off period. This isn't him being given a time-out, sit down, think this through. This is, from his perspective, getting worse. He has been abused in there. Someone started a fight with him. He has a bottle broken over his head, and then he gets thrown out for being a victim. That's not a cooling-off period. So I think you've got to boil that in when you start talking about, well, the judge decided there was a cooling-off period here. I think that is a weighing of the evidence, and that weighing of the evidence is the abuse of discretion that we need here to say that he should have given the second-degree murder instruction. Unless there are other questions. Thank you very much, Alex. Thank you for a very interesting case, well-written briefs, and very good arguments. And we'll take the case under advisement. Court is adjourned.  Great arguments, gentlemen. Really enjoyed it.